UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **United States of America** | ) | 05-10040-DPW[1] |
| v. | ) | |
| **Orlando Alicea** | ) | |

**MEMORANDUM IN SUPPORT OF**
**GOVERNMENT'S MOTION FOR REVOCATION OF RELEASE ORDER**

The United States respectfully seeks revocation pursuant to 18 U.S.C. § 3145 of Chief Magistrate Judge Swartwood's order of January 21, 2005 releasing defendant Alicea pending trial. Under the factors set forth in 18 U.S.C. § 3142(g), the government submits that the presumption of detention in this case cannot be overcome, because the dangerousness to the community and the risk of flight are overwhelming.

### I. FACTS

From March 2004 to the date of these arrests (January 14, 2005), a cooperating witness (CW), who had previously been determined to be reliable, worked on behalf of the government[2] in the investigation of a local money remitter, co-defendant Amaro Millan (Millan), who was suspected of laundering drug proceeds. As part of this investigation, the CW wired "drug proceeds" to Colombia through Millan on more than a dozen occasions, and Millan broke the money down into individual wires beneath the identification thresholds, and recorded fictitious names for the sender and recipient of the funds. See generally Affidavit of Special Agent Derek

---

[1] The Government's Motion for Revocation of Release Order was filed on January 26, 2005 (copy attached), but it appears not to have been entered as an MBD matter. Accordingly, the Government has entered the case number assigned to the indictment, which was issued on February 24, 2005.

[2] The CW was working on behalf of U.S. Immigration and Customs Enforcement (ICE) and the Internal Revenue Service (IRS), which were working together as part of a New England task force on money laundering investigations.

M. Dunn, attached to and made part of the Complaint, at ¶¶ 1-44.[3]  In addition to wiring the money himself, Millan directed the CW to a money remitter in East Boston whom Millan said could handle a greater volume without detection.  He told the CW to take the money to this contact, "Put in some water and wash it well."  ¶¶ 14-15.

During the course of the money laundering investigation, the CW repeatedly mentioned that the money came from the drug business.  Transcript of Detention Hearing, January 18, 2005 (Tr 1/18/05) at 6.  Millan repeatedly told the CW that he was interested in buying drugs from the CW.  On March 3, 2004, Millan told the CW that he could move 5 to 7 weekly, if it was "white and shiny."  ¶ 45.  On July 13, 2004, Millan asked the CW whether the CW had anything for him.  The CW turned Millan down, saying that he preferred dealing with the proceeds to dealing with drugs.  ¶ 46.  Millan still inquired a few days later, stating on July 17, 2004 that he knew someone who wanted heroin.  ¶ 47.  Millan then volunteered that he could get "sin semilla" or "weed" at a good price, and that the profits are high and the risks are law, because the penalties for getting caught are practically non-existent.  Id.

After Millan raised the issue of purchasing drugs from the CW three more times over the course of August and September, ¶¶ 48-50, the CW told Millan on November 22, 2004 that "the stuff" was available and that "10" would be brought here.  ¶ 52.  On December 3, 2004, the CW told Millan that it would be arriving soon, and Millan told the CW that he was interested as long as the price and quality were good.  Millan noted that "it's going for twenty" and "it has to be white and shiny . . . it has to be white and it has to shine because it's for gringos."  ¶ 54.  Millan

---

[3]This Affidavit is hereinafter referred to simply by paragraph number, using the symbol ¶.

stated that he would introduce the CW to his nephew [later identified as defendant Alicea]. ¶ 55.

On December 16, 2004, defendant Alicea had a luncheon meeting with the CW and undercover agents from the Federal Bureau of Investigation. The meeting lasted more than an hour. The meeting was tape recorded, and both agents are available to testify at trial.

During this December 16, 2004 meeting, an undercover agent (UC) told Alicea, in appropriate code, that the money and the "music" (referring to the cocaine) would not be in the same location. ¶ 63. Alicea was told that someone would have to show the money prior to picking up the cocaine, and that someone would then need to stay with the money and the CW, while Alicea went to pick up the cocaine. After Alicea had examined the cocaine, he would call his associate to turn over the money, and then he would be given the cocaine. The UCs asserted that the price for "one" (one kilogram) would be "twenty" (twenty thousand dollars). Alicea responded that he wanted to start with ten kilograms, and Alicea asserted that he currently paid twenty to buy a single kilo. He stated, in appropriate code, that he expected a better price for a higher quantity. He stated, in code, that his plan was to get several "Djs" to band together, and that he wanted a good price so that he could profit. Id.

As this December 16th meeting continued, the UCs asked Alicea what price he could do for ten, and he responded, in a mixture of Spanish and English: "I've got to keep in mind 'el tio' [the uncle], me entiende [you know]?" Alicea then proposed a price of 17. Id. He indicated that his prior dealings were with Dominicans, and he was not comfortable dealing with them. Id. The UCs asked Alicea how he intended to transport the cocaine, and he stated that he would put it in the tool box of his truck. Alicea said that he intended to use his truck and his tool box because the only people he knew with "hides" in cars are Dominicans, and he did not want to ask

3

them for a car. ¶ 64. Toward the end of this December 16, 2004 luncheon meeting, the UCs and Alicea agreed to a price of $ 18,000 per kilogram for the ten kilograms. Alicea stated that he could do this price if in the future, the price could be better. ¶¶ 65-66.

On January 12, 2005, Alicea and Millan both met with the UCs to confirm the deal. They provided cellular telephone numbers on which they can be reached. ¶ 69. Both Millan and Alicea were called by a UC on January 13, 2005, and agreed to meet the next day. On January 14, 2005, the UCs met with Alicea, Millan and the CW at Millan's store. Millan showed the UCs a box containing several bundles of money. He pulled out a bundle and said "this is ten thousand, and there are 18 bundles here." ¶ 70. The UCs and Alicea then went to a Brockton garage to transfer the cocaine. Alicea prepared to load the cocaine into his tool box. The UCs told him, in essence, to make sure the quality was acceptable, because if there was a problem, they wanted to know now versus later. Tr 1/18/05, pp. 36-37. Id. Alicea took the cocaine into a small bathroom in the warehouse and cut one of the bundles open. The UCs told Alicea that he needed to call his uncle to say that things were ok, so that Millan would release the money. Tr 1/18/05, p. 42. Alicea called Millan, and then put the cocaine into his toolbox inside his truck. Alicea was then arrested. Millan was arrested after providing the money to the UCs.

## II. STANDARD OF REVIEW

In <u>United States v. Tortora,</u> 922 F.2d 880, 882 (1st Cir. 1990), the First Circuit held that a District Judge must conduct a "<u>de novo</u> review" of a contested detention order issued by a magistrate judge. 922 F.2d at 883 n. 4. Requiring the district court to conduct a <u>de novo</u> review does not mean that it must conduct a <u>de novo</u> hearing. Nor does it mean that the district court

must disregard the magistrate's fact finding and the inferences to be drawn therefrom.  The thrust of <u>Tortora</u> is thus that the district court should not act as if it were an appeals court reviewing the acts of a district court and thereby constrained by the evidence presented and fact finding conducted below.   <u>Tortora</u> mandates that the district court must instead make an independent determination of the detention decision, unconstrained by the limits of the magistrate's conclusions or the record established in the original detention hearing.

In <u>United States v. Koenia</u>, 912 F.2d 1190 (9th Cir. 1990), one of the cases on which <u>Tortora</u> relies, the court aptly summarized the district court's power and obligation in reviewing a magistrate's detention order:

> [t1he district court . . . need not] start over in every case, and proceed as if the magistrate's decision and findings did not exist. The district court erred, however, in ruling that it could review the magistrate's findings under a "clearly erroneous" standard of deference.  It should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference. If the performance of that function makes it necessary or desirable for the district judge to hold additional evidentiary hearings, it may do so, and its power to do so is not limited to occasions when evidence is offered that was not presented to the magistrate. The point is that the district court is to make its own "de novo" determinations of facts, whether different from or an adoption of the findings of the magistrate.

912 F.2d at 1193.[4]

---

[4] Other cases cited by <u>Tortora</u> are to the same effect.  <u>See, e.g.</u>, <u>United States v. Hurtado</u>, 779 F.2d 1467,1480 (11th Cir. 1985) (district court must conduct an independent review); <u>United States v. Maull</u>, 773 F.2d 1479, 1481-2 (8th Cir. 1985) (district court to conduct de novo review of detention issue, and could hold hearing; court also empowered to accept stipulated facts in such a de novo proceeding); <u>United States v. Delker</u>, 757 F.2d 1390, 1393-94 & n. 3 (3d Cir. 1985) (district court required to make independent review of magistrate's detention order, although "[i]n most cases the district court will find it useful to consider carefully the decision and reasoning of the magistrate" and "may in an informed exercise of discretion, determine whether additional evidence is desirable" beyond what was presented to the magistrate).

The government notes that there are numerous audiotapes as well as two videotapes available for the court's review, should the Court wish to review the evidence itself.

### III. ARGUMENT

The burden of establishing that no condition or combination of conditions will reasonably assure a defendant's appearance for trial rests on the government. However, when the defendant is charged with a controlled substance offense punishable by a maximum term of 10 years or more, the government is aided by § 3142(e)'s rebuttable flight presumption. United States v. Palmer-Contreras, 835 F.2d 15, 17 (1st Cir. 1987). While the burden of persuasion always lies with the government, "even after a defendant has introduced some evidence to rebut the flight presumption, the presumption does not disappear, but rather retains evidentiary weight . . . ." Id.

Pursuant to 18 U.S.C. § 3142(g), in order to determine whether a defendant has overcome the presumption of dangerousness to the community and of flight risk, the Court must look to four factors:

> (g) Factors to be considered. – The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning--
>
>     (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>
>     (2) the weight of the evidence against the person;
>
>     (3) the history and characteristics of the person, including--
>
>         (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

The government respectfully submits that in this case, consideration of these factors both for risk of flight and for dangerousness to the community mandates detention.

    A.    <u>Alicea's History</u>

With regard to the first two statutory factors, §§ 3142(g)(1) and (2), Alicea is charged with a serious narcotic offense: conspiracy to possess cocaine, with intent to distribute, and the evidence against him is very strong.  The statute provides for its maximum punishment when at least five kilograms are involved: defendant Alicea personally arranged for the purchase of twice that amount, ten kilograms, as an initial matter, and negotiated to receive a lower price for future deals if he purchased greater quantities.  Alicea made clear in that conversation that he had purchased cocaine in kilogram quantities on previous occasions, and was interested in becoming a bigger player.  He stated that he had previously been paying 20 thousand dollars for one kilogram, and that he wanted to purchase 10 kilograms from the undercovers, with larger purchases in the future.  He personally picked up the cocaine, broke it open to check the quality, called the person he referred to as uncle ("el tio": co-defendant Millan), to approve the release of the $180,000 purchase money, and loaded the cocaine into his truck.  Therefore, these factors weigh in favor of detention.

The third statutory factor: family ties, employment, community ties, and past conduct, also weighs in favor of detaining Alicea.  Alicea was released from prison nearly five years ago,

and has not been gainfully employed since that time.  He asserted to Pre-Trial Services that he was the owner and operator of Landy Home Improvements.  Tr 1/18/05, p. 58.  However, the evidence at the detention hearing showed that Alicea's only client in this business is his brother, Edwin Alicea, his proposed third party custodian, Tr 1/18/05, pp. 61, 63 & 66, and that the nature of the work is less "employment" and more "helping out" his brother.  Tr 1/18/05, at pp. 63- 66.  Alicea has fathered two children, with a third soon to be born, but has never married the mother of either child.  Alicea seems to have family available to him in the nearby community, and especially benefits from the support of his brother.  However, none of those family ties deterred Alicea from setting up a deal for 10 kilograms of cocaine, at a time when the brother was, aside from narcotics deals, Alicea's only source of income.

  B. <u>Risk of Flight</u>

Based on the above analysis, Alicea has "an extremely strong incentive to flee based upon the length of the prison term he faces under the charges pending against him and the likelihood of conviction."  <u>United States v. Pierce</u>, 107 F. Supp. 2d 126, 128 (D. Mass. 2000).  Alicea has a prior felony drug conviction, and therefore, under 21 U.S.C. § 841(b)(1)(A)(ii), he is subject to a  he is subject to a statutory <u>minimum</u> sentence of twenty years imprisonment.  This 34 year old defendant will be at least 54 when he is released from prison if convicted.  The likelihood of conviction is high, because the evidence against Alicea is overwhelming: he performed the negotiations with two undercover FBI agents, both of whom are available to testify against him.  The luncheon meeting where the negotiations took place was audiotaped, and the tapes are available to play for both this Court and for the jury.  The pick up of the cocaine was also undertaken with multiple FBI agents present, both in the building where he

picked up the cocaine and monitoring the activities on audio/video feed, and these agents are available to testify against Alicea at trial. The actual purchase and loading was recorded with both video and audio, and the tapes will be played for the jury (and for this Court, if the Court chooses to schedule a hearing in this matter).

Given a mandatory twenty year sentence upon conviction, and strong evidence against him, the incentive to flee is powerful. As Judge Gorton noted in United States v. Marquez, 113 F. Supp. 2d 125, 128 (D. Mass. 2000), the strength of the evidence, especially videotape, combined with a lengthy prison sentence upon conviction, poses a tremendous risk of flight:

> Marquez does pose a risk of flight for several reasons. First, he has an extremely strong incentive to flee based upon the length of the prison term he faces in connection with the charges pending against him and the likelihood of conviction. The government has recorded Marquez on two videotapes participating as a lookout and "right hand man" to [co-defendant] during drug transactions.

See United States v. Dillon, 938 F.2d 1412, 1416 (1st Cir. 1991); United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) ("If, indeed, as the district court concluded, the evidence against defendants is strong, the incentive for relocation is increased.").

Moreover, Alicea's case is consistent with the Congressional findings of fact in favor of detention in drug cases. Congress has found that persons charged with major drug offenses often have the foreign ties and resources necessary to escape with ease to other countries. United States v. Perez-Franco, 839 F.2d 867, 869 (1st Cir. 1988) (citing S. Rep. No. 225, 98th Cong., 1st Sess. 20, 23-24 (1983), reprinted in 1984 U.S. Code & Admin. News, pp. 23, 26, 27). The First Circuit has noted that when large amounts of drugs are at stake, the Court can infer, for detention purposes, that the defendant is connected to persons or an organization with great resources, which could finance defendant's relocation. See Palmer-Contreras, 835 F.2d at 18. In

this case, within a month of Alicea meeting with the undercover agents and agreeing to a price and quantity, he and his "uncle" were able to deliver $180,000 in U.S. currency for the cocaine. Alicea is therefore "connected to" persons who could afford to finance, and would benefit from, his relocation.

Alicea's response to this presumptive risk of flight is to offer his brother, Edwin Alicea, as a third party custodian. Alicea asserts that he, his girlfriend, and his child will live with his brother, and his brother will secure his appearance with a property bond, and the Chief Magistrate Judge ordered this as a release condition. However, the government respectfully submits that this is inadequate to ensure defendant's appearance. As the First Circuit noted in United States v. Moreno, 30 F.3d 127 (1st Cir. 1994) (unpublished), "proposed custodians . . . are easily manipulated and their effectiveness hinges on the defendant's good faith." In the instant case, the proposed custodian appears to have supported the defendant since his release from prison in 2000, see Tr 1/18/05, at 63, 66 and Pretrial Services Report, and has seen his brother "everyday just about," Tr 1/18/05 at 63, during that time. He describes their relationship as close. Nevertheless, Edwin Alicea's support and devotion was not sufficient to prevent defendant Alicea from picking up 10 kilograms of cocaine in Brockton the week before the hearing. And Edwin Alicea, the proposed custodian, who had seen his brother just about every day since his release from prison, had "no idea" that this was occurring, and apparently no idea about the meetings to set it up, or the prior transactions with the Dominicans that Alicea described to the undercover agents on tape. Tr 1/18/05, at pp. 63- 69.

Accordingly, while the government defers to the Magistrate Judge's determination that Edwin Alicea is a respected businessman, Order at 17, and the government assumes the good

faith of Edwin Alicea as proposed custodian, the government respectfully submits that Edwin Alicea cannot effectively ensure that defendant Alicea will not flee.  See Marquez, 113 F. Supp.. 2d at 128.  As the Court noted in Marquez,

> [T]he record indicates that [defendant] is able to conceal illegal activity from [the proposed custodian.]  Thus, there is reason to doubt [the proposed custodian's] ability to monitor [defendant's] activities and report any non-compliance with bail conditions that this Court might impose were he released.

Id.  For these reasons, the government submits that defendant Orlando Alicea is a risk of flight and should be detained.

   C.   Dangerousness to the Community

Finally, under the analysis provided by the statute and the First Circuit, defendant Alicea is a danger to the community.  He was ready, willing, and able to negotiate the purchase of, and acquire, ten kilograms of cocaine, for distribution purposes.  He told the undercover agents that he had previously dealt in kilogram quantities of cocaine, and that he had a ready list of clients, people with whom he had grown up.  Under the First Circuit's analysis in United States v. Moreno, 30 F.3d 127 (1st. Cir. 1994) (unpublished), this willingness and ability to deliver large quantities of drugs is sufficient to establish dangerousness.  See also United States v. Marquez, 113 F. Supp. 2d 125 (D. Mass 2000) (where the record showed that defendant had participated in drug transactions and was designated to take delivery of a large amount of drugs by the UCs, the government made a showing of dangerousness);  United States v. Gutierrez, 106 F. Supp. 2d 172 (D. Mass. 2000) (even without showing of large quantities of drugs, violence, or guns, sale of drugs was sufficient to show dangerousness).

The Magistrate Judge found that Alicea was a danger to the community, but found that this was overcome by the proposed custodianship by Edwin Alicea.  The government

11

respectfully disagrees.  The defendant was being financially support by his brother Edwin, and working with him nearly every day, at the time that he negotiated and consummated the 10 kilogram purchase at issue in the indictment.  Custodianship relies on the good faith of the defendant, and this defendant has previously, at least twice, conspired to commit drug deals behind Edwin Alicea's back.

Therefore, as noted in <u>United States v. Moreno</u>, 30 F.3d 127 (1st Cir. 1994) (unpublished), these conditions do not adequately ensure community safety, and the defendant should be detained.

                Respectfully submitted,

                MICHAEL J. SULLIVAN
                United States Attorney

By:   /s/   Nancy Rue
       Nancy Rue
       Assistant U.S. Attorney
       U. S. Attorney's Office
       John Joseph Moakley U.S. Courthouse
       One Courthouse Way
       Boston, MA 02210